# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

SECURITIES AND EXCHANGE
COMMISSION,

               *Plaintiff*,

v.

ROBERT SCOTT MURRAY;
TRILLIUM CAPITAL, LLC;

               *Defendants*,

THE R. SCOTT MURRAY
REMAINDER TRUST — 2000,

               *Relief Defendant*.

</td><td>

**Case No. 24-cv-11432**

**JURY TRIAL DEMANDED**

</td></tr>
</table>

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission" or "SEC") alleges as follows:

### SUMMARY

1.    This complaint concerns a fraudulent scheme, misrepresentations, and omissions by Defendants Robert Scott Murray and Trillium Capital LLC ("Trillium"), a company owned and solely controlled by Murray (collectively, "Defendants"), (i) to manipulate and artificially increase the stock price for Getty Images Holdings Inc. ("Getty") by announcing that Trillium was conditionally offering to purchase Getty for $10/share in cash, nearly double the stock's previous day's closing price, and (ii) to sell shares of Getty stock and Getty options into the inflated market.

2.    Between October 2022 and April 2023, Murray built a substantial long

position in Getty securities. Murray spent over $1.6 million to purchase a total of 299,350 Getty shares and over $1 million to buy thousands of Getty options contracts, eventually acquiring a stock and options interest covering over 12% of Getty's public stock float not owned by Getty affiliates.

3.      In early April 2023, Murray and Trillium issued four press releases designed, in part, to increase Getty's stock price. They urged Getty to explore a strategic sale and announced that Murray was seeking a board seat.

4.      Getty executives were skeptical that Murray's activism could succeed, given that nearly 95% of Getty's stock was owned by a handful of affiliated entities. Although those press releases had little effect on Getty's stock price, they introduced the market to Murray and Trillium, burnishing their credentials as legitimate, substantial market participants with a keen interest in Getty.

5.      By mid-April, Murray was facing growing losses on his Getty investment and devised what he called his "new plan": Murray would claim that Trillium was seeking to take over Getty with a conditional cash price offer at a significant premium. Murray expected Getty's stock price and trading volume to spike on the news, allowing him to unload his Getty stocks and options.

6.      Murray spent much of the week before April 24, 2023, putting his scheme into motion. In addition to the four earlier press releases, Murray drafted a fifth press release, and he spoke with his brokerage service, working to ensure that he could rapidly exit his Getty position. He texted, spoke, and met with his friend (to whom he had recommended buying Getty stock), telling her to wait to sell her shares of Getty stock. Murray also coordinated to make sure that Trillium's next press release was timed to be released shortly before the market opened.

7.     On April 24, 2023, Trillium and Murray issued a pre-market press release announcing Trillium's "PROPOSAL TO ACQUIRE GETTY IMAGES FOR $10 PER SHARE," or nearly twice the prior trading day's closing stock price.

8.     The proposed transaction would have required nearly $4 billion in cash to pay shareholders alone. But Murray knew, or was reckless or negligent in not knowing, that neither Trillium nor Murray had anywhere close to $4 billion. Trillium's brokerage account had a balance of around $17.32. For his part, Murray's brokerage accounts in April 2023 had a net value of just around $13 million. Murray's personal capital pool—even with Trillium's $17.32—was far too shallow to float a $4 billion transaction. Considering Murray and Trillium's inadequate resources, the putative transaction would have required significant financing.

9.     As a former public company officer and director with prior acquisitions experience, Murray was aware, or reckless or negligent in not knowing, of the significant preparation and effort by multiple parties that goes into making a *bona fide* acquisition proposal, securing financing, and completing a multi-billion-dollar transaction. But Murray never contacted an investment banker or advisor to secure or even discuss financing before releasing the fake proposal to acquire Getty.

10.     Although the April 24 proposal was a sham, the financial press and market initially reacted as if it were genuine. Getty stock trading volume and price surged as the market opened. Murray began dumping both his shares of stock and options, selling all his Getty shares within an hour after the market opened.

11.     Murray's immediate liquidation of his investment in Getty confirms that he had no plan to actually acquire the company. After he sold his shares and as many options as he could sell, Murray fielded calls from financial reporters, where

he continued to claim that Trillium's offer was genuine and intimated that he still held a significant stock position in the company. In truth, Trillium's proposal was nothing more than a ruse to pump Getty's stock price and trading volume so Murray could dump his position.

12.     In December 2023, federal investigators approached Murray's friend and told her that they were investigating her Getty trades. On a recorded line, she called Murray and told him that federal investigators had reached out. Murray encouraged her to lie and to tell the investigators that she and Murray never discussed Getty. Murray directed her to delete all his text messages from her phone and drafted a proposed written response to federal investigators that he knew was untrue.

13.     Murray traded Getty securities within his personal brokerage account, his retirement account, and accounts that he owned jointly with his family. Murray also traded Getty securities within the Robert Scott Murray Remainder Trust's ("RSMR Trust") brokerage account.

14.     Murray and the accounts he controlled reaped an illicit benefit (including avoided losses). The Trust is not entitled to those ill-gotten gains from Murray's unlawful activities, so it has been named a relief defendant in this case.

15.     Murray's friend, whom he had tipped and who sold her shares of Getty stock on his recommendation, also benefited from Murray's fraudulent scheme.

16.     As a result of the conduct alleged in this Complaint, Defendants Murray and Trillium violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. § 78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5].

## JURISDICTION AND VENUE

17.   This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

18.   Venue is proper because Murray resides in the District of Massachusetts, he transacts business within this District, Trillium is registered in Massachusetts, Trillium's principal place of business is in this District, the allegations in this Complaint describe events that happened in this District, and some of the offers or sales of the securities at issue occurred within this District.

## DEFENDANTS

19.   **Robert Scott Murray**. Murray currently resides in Mashpee, MA. Since 2007, Murray has been self-employed as the Founder, Managing Member, and Managing Partner of Trillium Capital LLC. Murray previously has been Chief Financial Officer (CFO), Chief Executive Officer (CEO), and director of publicly traded companies. According to the Chartered Professional Accountants of Ontario, Murray is a chartered professional accountant.

20.   **Trillium Capital LLC**. Trillium was organized in Delaware as a limited liability company on June 29, 2007. Trillium was registered in Massachusetts on September 12, 2007, and its principal place of business is Mashpee, MA. Murray is the LLC's sole member and holds all officer positions at the company (President, Secretary, and Treasurer).

21.   Trillium maintains a public-facing website, available at https://www.trilliumcapitalllc.com. According to its website, "Trillium Capital is a

new kind of venture investment partnership located in Boston." Trillium's website claims that its "partners have led many successful companies" "with over 30 years each of operating and industry experience in" various fields including software, technology, and e-commerce.

22.     Trillium has no employees. Murray appears to be the only individual affiliated with or employed by the company.

23.     From October 2022 through May 2023, Trillium Capital LLC maintained at least one brokerage account. That account held no securities, and its cash balance never exceeded $17.32 during that period.

24.     **The Robert Scott Murray Remainder Trust ("RSMR Trust")**. RSMR Trust is a Massachusetts trust created by Murray in 2000 for the benefit of his spouse, children, and more remote issue. Murray is a donor and trustee. RSMR Trust has been named a Relief Defendant in this case.

## OTHER INDIVIDUALS AND ENTITIES

25.     **Getty Images Holdings, Inc. ("Getty")**. Getty is a Delaware corporation with its corporate headquarters located in Seattle, Washington.

26.     Getty's common stock trades on the New York Stock Exchange under the ticker symbol "GETY."

27.     On April 21, 2023, about 95% of Getty's outstanding shares of common stock were owned by a few affiliated entities. Only about 5% of Getty's common stock—or 20,833,797 of Getty's outstanding shares—was held by non-affiliates.

28.     **Friend.** Murray's Friend is a 43-year-old resident of Nantucket, MA. She is a real estate agent and self-employed bookkeeper. They have been good friends for several years and frequently communicate via phone and text. She often

asked Murray for investment advice, including stock tips and real estate advice. Murray's Friend purchased Getty stock at Murray's urging in early April, and then closed out her Getty position on April 24 at Murray's advice. Murray caused her to benefit from his fraudulent scheme.

## FACTS

### I.   Murray Builds a Large Investment Position in Getty.

29.    From October 2022 through April 2023, Murray traded Getty securities across six accounts at his broker. Those accounts included Murray's individual trading account, Murray's retirement account, three accounts that Murray owns jointly with his family, and an account in the name of the RSMR Trust.

30.    Trillium Capital LLC also has an account at the same broker, but that account did not hold or trade Getty securities (or any securities at all) between October 2022 and April 2023.

### A.   Murray Purchased Getty Stock and Messaged the Board.

31.    Murray began buying Getty stock in October 2022. By December 31, 2022, Murray had spent $1,252,162.11 purchasing 207,700 shares of Getty stock, at an average price of around $6.03 per share.

32.    In November 2022 and February 2023, Murray posted on LinkedIn that he was hearing rumors that Getty would soon be sold. Getty was not sold.

33.    By March 20, 2023, Getty's stock price closed at $3.56 per share, which meant Murray faced an unrealized loss of over $500,000 on his Getty investment.

34.    The next morning, Murray contacted Getty's CEO and CFO through LinkedIn messenger, stating that he was "a shareholder – hoping the company and

board does [*sic*] something to bolster the stock – perhaps take private or a strategic sale is in order."

35.     On March 28, 2023, Murray emailed two copies of the same letter to two Getty directors, copying Getty's full Board of Directors, urging them to take action to increase Getty's stock price. In the letter, Murray claimed that Getty was undervalued by more than $2 billion and among other things, suggested cutting corporate costs, finding a strategic buyer, or selling Getty to a private equity firm.

36.     Murray closed his letter by warning that he and Trillium had previously conducted a shareholder activist campaign involving another company. Murray also wrote that he and Trillium would publicly issue their views if Getty did not publicly address his and Trillium's recommendations by April 17, 2023.

37.     Internally, Getty executives were skeptical, noting that shareholder activism with respect to Getty stock was "impossible … given [the] concentration of ownership." Getty did not respond to the letter.

38.     After March 20, 2023, Murray began purchasing more shares of Getty stock. And as of April 11, 2023, Murray had spent a total of around $1.65 million purchasing a total of 299,350 shares Getty stock, at an average price of about $5.51 per share.

## B.     Murray Purchased Getty Options Contracts.

39.     In early April 2023, Murray purchased Getty call options for the first time in his accounts.

40.     A call option is an agreement that entitles the holder of the option to purchase a security under specified terms. The owner of a call option has the right, but not the obligation, to buy the agreed-upon security at a set price (the "strike

price") on or before the expiration date for that option.

41.     If the strike price is below the current market price of the security, the holder of a call option can exercise the option, purchase the security at the strike price, and sell the security at the market price for a profit. The owner of an option may also sell the option in the market.

42.     Generally, the holder of a call option benefits when the price of the underlying security rises. Even if the stock price does not exceed the strike price, an increase in the price of the underlying security can still cause the value of the option contract to increase because the higher the share price, the more likely the stock price will increase above the option strike price before the contract expires.

43.     An "out-of-the-money" call option is a call option with a strike price that is higher than the market price of the underlying asset. For example, if a stock is trading at $5 per share, a call option to purchase that security at $7.50 per share is "out-of-the-money."

44.     Exchange-traded options have an expiration date. If an out-of-the-money option is not exercised by the expiration date, it can no longer be exercised, and its value generally goes to zero.

45.     Murray ultimately spent over $1 million buying tens of thousands of Getty options contracts in his two accounts that were approved for options trading. By April 10, 2023, Murray had spent approximately $428,964[1] purchasing 13,105 call options contracts in his individual account, and around $616,365 purchasing 15,026 call options contracts in the RSMR Trust account.

---

[1] Not including transaction costs.

## II.     Murray Urges His Friend to Buy Getty Stock

46.     On March 24, 2023, Murray texted his Friend "Im about to do this to gETY [*sic*]" and attached a link to a June 8, 2020 press release from his prior activism campaign involving a different company. She responded "What's GETY?"

47.     On April 5, 2023. Murray again texted his Friend about Getty:

Murray: Did you buy GETY[?] // I own almost 500k shares now // . . . // Buy
        gETY [*sic*] // Lots of it.
Friend: I did not buy GETY. I didn't know that's what you meant in your text
        earlier
Murray: Yes // GETY
Friend: At the current price?
Murray: I [*sic*] is likely to increase substantially y [*sic*] soon.

48.     After receiving that text message, his Friend immediately called Murray, and they spoke for nearly half an hour. After the call, the Friend placed her first-ever orders to purchase Getty stock. Later that day, she followed up:

Friend: My portfolio is about 500k and I just bought 50k of the stock. I still
        have over 600k in margin. Do you think I should buy more? // 600k in
        "margin available"
Murray: 'I [*sic*] have bought more today
Friend: Maybe I'll buy 50k more. But wouldn't be comfortable buying more
        than that. What do you think?
Murray: I just emailed u the letter I sent to the board //  Press release will be
        similar

49.     At the beginning of April, the Friend's accounts at her broker held securities and cash valued at around $627,000, with no margin balance and no Getty stock. By April 12, 2023, the Friend had purchased approximately $529,000 of Getty at Murray's urging and virtually all on margin, *i.e.*, using funds borrowed from her broker which incurred interest and were subject to maintenance requirements.

### III.   Murray and Trillium Engaged in an Unsuccessful Shareholder Activism Campaign to Increase Getty Share Price.

####    A.   Trillium Released an "Open Letter to Getty Images Board."

50.    Murray did not wait until the April 17, 2023 deadline he had given for Getty's Board of Directors to respond to his March 28, 2023 letters. Instead, on April 11, 2023, at 7:00 a.m., Murray and Trillium issued their first press release regarding Getty and its stock. The press release was titled "TRILLIUM CAPITAL ISSUES OPEN LETTER TO GETTY IMAGES BOARD," with the subtitle: "About $1.1 BILLION LEFT ON THE TABLE AT GETTY — Stock Should Trade Over $12 Per Share." Just the day before, Getty's stock price had closed at $6.50 per share.

51.    Murray's April 11 press release echoed the letters Murray had previously sent to Getty, providing recommendations for "opportunities that the Board can take to unlock substantial incremental Enterprise Value," including a sale of the company and replacement of the executive management team.

52.    The press release devoted two pages to a financial valuation that gave the superficial impression of a detailed investment-banking analysis in support of a $12.58 stock price valuation for Getty. Murray did not engage an investment bank or other competent financial advisor to prepare or consult on his analysis.

53.    The April 11 press release claimed that that "[t]he principles [*sic*] of Trillium Capital LLC own hundreds of thousand [*sic*] shares of common stock and common stock equivalents of Getty."

54.    A statement at the end of the press release, said, among other things, that "we may sell any or all of our holdings or increase our holdings . . . without updating this letter or providing any notice whatsoever . . . (except as otherwise required by law)."

55.     The market initially responded positively to Trillium's press release. Getty's trading volume on April 11 increased by 4.7 times the trading volume from the previous day. Getty's stock price also rose as high as $7.29 per share during intraday trading before closing at $6.23 per share (lower than the previous day's close of $6.50 per share). And an article noted that "Getty Images stock gets a boost after activist investor recommended a sale of the company."

56.     Beginning on April 11, Murray began to sell some of his Getty stock and options. Some of these sales were marked for "wash sale" tax treatment by his broker because a sale of a security at a loss and purchase of the same or substantially identical security within a 30-day period are not recognized as investment losses under IRS rules.

57.     On April 12, 2023, Getty stock closed at $6.25 per share.

58.     On April 12, 2023, Murray emailed Getty requesting that his name be included for election to the Board of Directors. Getty's General Counsel responded to Murray that, "As publicly disclosed by the Company . . . the time for nominating directors for election at the 2023 annual meeting of shareholders has already passed (the deadline was March 31, 2023)."

**B.     Trillium Proposed that Getty "Hire Investment Banking Firm."**

59.     On April 13, 2023, at 7:00 a.m., Murray and Trillium issued a second press release titled, "TRILLIUM CAPITAL PROPOSES GETTY IMAGES HIRE INVESTMENT BANKING FIRM," and it disclosed that Trillium and Murray had submitted a proposal to Getty's board "that they should engage a nationally recognized investment bank to evaluate the Company's strategic alternatives."

60.     Murray was quoted in the release, claiming that: "We have extensive

relationships with global investment banking and private equity firms. We would be happy to make introductions for the Company to expedite this process."

61.     The press release stated that "Trillium Capital believes that a strategic player would pay at least 12 times trailing EBITDA . . . [which] **would result in a stock price more than $12 per share**." (emphasis in original).

62.     This press release again stated that "[t]he principles [*sic*] of Trillium Capital LLC own hundreds of thousand [*sic*] shares of common stock and common stock equivalents of Getty." It also noted that Murray and Trillium "may sell any or all of our holdings or increase our holdings . . . without updating this letter or providing any notice whatsoever . . . (except as otherwise required by law)."

63.     The press release did not appear to have much, if any, effect on Getty's stock price or trading volume. Getty stock closed that day at $6.27 per share. Murray had emailed Getty on April 11 and requested that his proposal be considered at the company's annual general meeting of shareholders. Getty advised him on April 13 that his proposal was "deficient under Rule 14a-8 of the Securities Exchange Act of 1934" and the company "await[ed] his remedy thereof." Murray did not attempt to remedy the deficiency with Getty.

**C.     Trillium Announced that Murray Wanted to Join Getty's Board.**

64.     The next day, on April 14, 2023, at 7:00 a.m., Murray and Trillium issued their third press release. Titled "TRILLIUM CAPITAL REQUESTS SEAT ON GETTY IMAGES BOARD OF DIRECTORS," the release claimed that "Trillium Capital has already approached Getty to elect its Managing Partner, Scott Murray, to its Board."

65.     The press release stated that "[t]he principles [*sic*] of Trillium Capital

LLC own over 500,000 shares of common stock and common stock equivalents of Getty," in an apparent reference to Murray's options position.

66.     The press release included twelve bullet points touting Murray's "decades of experience," including as CFO, CEO and Chairman of the Board.

67.     The press release emphasized that Murray had "[c]ompleted and led over forty [40] M&A transactions," and "[c]ompleted over $2 billion of financing both public and private issuances." The press release claimed that Murray "[i]nvented the current PIPE & Tender SPAC process in 2008 that has been used in recent years to raise billions of dollars."

68.     The press release also highlighted Murray's experience as "a Chartered Accountant and a Financial Expert according to the rules of the United States Securities & Exchange Commission," his "[s]ubstantial experience leading public companies and making related filings with the SEC," and his "[d]eep experience with . . . leading investment banks and private equity firms."

69.     The press release quoted Murray promising, "If elected I would continue to hold shares of the Company that I own and would accept no compensation for my services on the Board." The press release did not disclose that Murray had missed the nomination deadline but suggested that "[i]n the event that Getty does not include Murray in its Proxy Material, you might be able to vote for him or change your vote at the Annual General Meeting."

70.     The press release included a statement that Murray and Trillium "may sell any or all of our holdings or increase our holdings . . . without updating this letter or providing any notice whatsoever . . . (except as otherwise required by law)."

71.     The press release did not appear to have much, if any, effect on Getty's

stock price or trading volume that day. Getty stock closed at $6.23 per share.

**D.    Trillium Outlined Purported "Path for Revenue Growth for Getty."**

72.    On Monday, April 17, 2023, at 7:00 am., Murray and Trillium issued a fourth press release titled, "TRILLIUM CAPITAL OUTLINES PATH FOR REVENUE GROWTH FOR GETTY." The press release set forth bulleted "ideas" for revenue growth at Getty, including pursuing strategic partnerships with well-known public companies, artificial intelligence projects, and other media companies.

73.    The press release noted that Trillium "continue[d] to believe that our Managing Partner, Scott Murray, should be appointed to the Board," and again stated that "the principals of Trillium Capital own over 500,000 shares of common stock and common stock equivalents of Getty."

74.    The press release included a statement that Murray and Trillium "may sell any or all of our holdings or increase our holdings . . . without updating this letter or providing any notice whatsoever . . . (except as otherwise required by law)."

75.    The April 17, 2023, press release had little, if any, effect on Getty's stock price or trading volume that day. Getty stock closed at $6.28 per share.

**IV.    Murray: "I Have a New Plan."**

76.    On Tuesday, April 18, 2023, Getty shares closed at $6.41 per share, and declined every day for the rest of that week until closing at $5.06 per share on Friday, April 21. As Getty's share price declined that week, Murray faced growing unrealized losses and took steps to execute a new plan to pump up the price of Getty's stock.

77.    Murray typically placed his own trade orders through his broker's online trading platform. But Murray sometimes called his broker's toll-free

customer service lines to seek assistance with trades and to discuss other issues.

78.     On Tuesday, April 18, 2023, Murray called his broker to request assistance because he was having difficulty rolling some of his Getty April call options into May call options. Murray called his broker to sell Getty call options expiring April 21 and to buy options with the same strike prices expiring May 19.

79.     On that call, Murray asked a representative about recent sales of Getty securities flagged as wash sales:

> Murray: . . . these are all show—a lot of my stock sales are showing as wash trades but when I sell *all* the stock it won't be a wash trade, right?
> Representative: . . . [Y]eah if you get rid of the entire position you wouldn't have a wash sale at that point.
> Murray: Right.
> Representative: Because the wash sale would have nothing to roll over to. And then as a reminder if you do buy back into the position 30 days after the wash sale. . .
> Murray: [Interrupting] **I won't be doing that.**
> Representative: . . . Would create a wash sale.
> Murray: **I won't be doing that.**

80.     On the same call, Murray asked his broker to remove the quantity limits on Murray's ability to trade options online. His broker's online trading platform had a default limit of 200 options contracts that a user could trade at one time. Murray indicated that he "need[ed]" the independent ability to sell more options through the online platform because he "ha[d] a lot of money at stake." In April 2023, Murray's only options trades and holdings were Getty call options.

> Murray: And how do I get to do more options? It limits me at like. . .
> Representative: [Interrupting] Yeah. As of right now, yeah, our default is going to be 200 online. We can definitely have that conversation as soon as we get these [other orders] in for you. We can definitely go to about one thousand, two thousand. Unlimited is not on the table.
> Murray: [Interrupting unintelligibly.] I have thousands of options. I need an [*sic*] unlimited. I need like **a lot**.

Representative: OK.
Murray: Because I have a lot of money at stake.

81.     The representative submitted the request for increased options trading

authority during that April 18 call.

82.     That same week, his Friend texted Murray, sharing her frustration

that Getty's stock price was not increasing. She had already sold a small percentage

of her Getty stock (approximately 13% of her holdings), at a profit. But she was

anxious to fully exit the position, which she purchased almost entirely on margin.

83.     On Tuesday, April 18, 2023, the Friend texted with Murray:

Friend: Ok, when is Getty getting bought? I need to sell my stock finally
        [crying emoji.]
Murray: Friday. // Monday. // ?????
. . .
Friend: What's happening on Friday/Monday? . . . Is that the deadline you
        gave to the board to do something?
Murray: **It's too secret**

84.     On Wednesday, April 19, 2023, Murray's Friend entered a good-til-

canceled (GTC) limit order to sell 20,000 Getty shares at $6.65 per share. A GTC

sell order at the Friend's broker would remain open over multiple trading sessions,

or until a buyer agreed to purchase the stock at the asking price or the order was

cancelled. Getty stock price never reached $6.65 per share the rest of the week, so

her GTC limit order remained unfilled going into the weekend.

85.     On Thursday, April 20, 2023, Murray again called his broker. During

that call, Murray shared with the representative that he had a new plan for Getty:

Representative: I know you mentioned that you're in a proxy war [with Getty]
        or something going on there. How's that been going? In your favor or
        not too much. . .
Murray: [Interrupting] No. I have a new. **I have a new plan**.
Representative: OK. Gotcha.
Murray: They refused to engage with me.

> Representative: Ah. That's, that's not good. Now, I'm sorry the original plan
> didn't work. Hopefully this next one does go in your favor.

86.     The representative explained that Murray's options trading limit had

been increased to 2,000 options contracts per trade, but the representative said he

would inquire about increasing Murray's limit even higher. Murray assured the

representative that he could handle a higher size limitation:

> Murray: There's no way I can get more option trading than 3,000, huh?
> Representative: So, yeah, just that 3,000 is going to be it, but outside of that
> I'll see what other options we have because I know that you are
> building quite a large position [in Getty]. **We want you to be able to,
> we want you to be able to close out of that if needed** so we'll go
> over, we'll go over what options there are there as well. OK?
> Murray: See if you can push it. I'm a very experienced trader.. . . I'm a
> financial expert under the rules of the SEC. I've run public companies.
> I've been a CFO. I really, really know what I'm doing.
> . . .
> I've been doing this for 40 years.
> . . .
> I do this professionally, I do this for a living.

87.     The representative confirmed that he understood Murray's underlying

concern was with quickly closing out his entire options position (which at that time

consisted only of Getty options). The representative also encouraged Murray to call

back if he needed to execute a single trade larger than his per-trade limit.

88.     On Thursday, April 20, 2023, Murray and his Friend met in person at

Murray's house. The Friend told Murray that she was planning to sell her Getty

shares by the end of the week, but Murray urged her to wait. He showed her a draft

of the April 24 press release and told her to wait until at least Monday to sell her

Getty shares. Murray thus believed that the April 24 press release would cause

Getty's stock price to increase.

89.     On Friday, April 21, 2023, Murray's broker called back to inform him

that he was authorized to trade up to 3,000 contracts per trade in certain accounts.

## V.   Murray Faced Growing Losses.

90.     By April 21, 2023, Murray faced a total unrealized loss of <u>more than</u> <u>$790,000</u> on his Getty investments.

91.     Getty closed at $5.06 per share on April 21. At that price, Murray faced an unrealized loss of <u>around $90,000</u> on the Getty stock that he still held.

92.     As of April 21, 2023, Murray's brokerage accounts held a total of 27,081 Getty call options contracts, which could each be exercised for 100 shares of underlying stock. Murray's options were all out-of-the-money and expired on May 19, 2023. Considering the closing prices for Getty options contracts on April 21, 2023, Murray faced an <u>unrealized loss of about $700,000</u> on his Getty options contracts.

93.     As of April 21, 2023, Murray had an interest in approximately 2,917,450 actual and underlying shares of Getty stock, <u>about 14% of Getty's non-</u> <u>affiliate public float</u>).

## VI.   Murray Took Steps to Put Plan in Motion.

94.     On Saturday, April 22, 2023, Murray called a company that handled press releases presumably to coordinate Trillium's next press release.

95.     On the morning of Monday, April 24, 2023, at 7:57 a.m., his Friend texted Murray asking, "Any news on Getty this morning?" Murray texted: "8:30." She responded with a thumbs-up emoji.

96.     The Friend promptly logged into her online accounts around 8:00 a.m. She first canceled her Wednesday, April 19, 2023, GTC limit order to sell Getty at $6.65 per share ($1.60 above the prior trading day's closing price of $5.06 per

share). She next placed a new GTC limit order to sell 20,000 shares at an even higher amount—$7.45 per share ($2.39, or about 47% above GETY's prior close). She also placed a second, new GTC limit order to sell 20,000 shares at $8.30 per share ($3.24, or about 64% above GETY's prior close).

97.    The Friend placed her orders nearly 30 minutes before Trillium issued its press release on April 24, 2023. Those trades show that after talking with Murray, the Friend expected Getty' stock price to rise substantially higher than even $6.65, including as high as $8.30 on the news of Trillium's takeover proposal.

**A.    Murray Released a Sham Proposal to Buy Getty in Cash at $10 per Share.**

98.    On April 24, 2023, at 8:30 a.m. Murray and Trillium issued a press release titled: "TRILLIUM CAPITAL ISSSUES [*sic*] PROPOSAL TO ACQUIRE GETTY IMAGES FOR $10 PER SHARE." The release stated that Trillium proposed to purchase Getty "for $10 per share in cash."

99.    The sham proposal at $10 per share cash offer was nearly twice the prior trading day's closing stock price of $5.06 per share. Purchasing all outstanding stock at that price would require approximately $3.95 billion in cash, at a point in time when Defendants' total assets were nowhere close to that amount.

100.    The April 24 press release stated that Trillium's principals owned "hundreds of thousands of shares of stock and common stock equivalents of Getty" and announced that "[t]he **principals of Trillium Capital will hold their shares of common stock of the Company** if our non-binding proposal reaches a favorable conclusion." (Emphasis added).

101.    The press release harkened back to groundwork laid in Trillium's prior releases by highlighting Murray's "decades of experience in corporate governance,

strategy, finance, technology and building scale companies."

102.    The press release noted that Trillium's proposal was "contingent on a number of things" including "immediate engagement by [Getty's Board of Directors]," "due diligence," "financing arrangements," entering a "contract," "filing and completion of all regulatory matters," and "approval of shareholders."

103.    The press release concluded: "We believe that our non-binding proposal might create substantial value for the shareholders of Getty."

104.    The press release also noted that Murray's and Trillium's "views and holdings could change at any time . . . without updating this letter or providing any notice . . . (except as otherwise required by law). We may sell or [sic] some of [sic] all of our holdings of Getty at any time without notice."

105.    At around 8:50 a.m., Murray texted his Friend a link to the release.

**B.    Getty Stock Initially Surged Upon News of the Proposal.**

106.    Before the NYSE market opened at 9:30 a.m., Murray's proposal had already sent Getty's stock price spiking 69%, to $8.55, in premarket trading.

107.    Getty's trading volume surged at the market open. Trading volume was significantly higher on the day, approximately 30 times Getty's average daily trading volume and 57 times the prior trading day's volume.

108.    Getty's stock price rose as high as $7.45 per share during NYSE core trading hours (9:30 AM to 4:00 PM), ultimately closing at $6.63 per share. Other than Trillium's sham buyout proposal, there was no news on the morning of April 24, 2023, that would have caused Getty's stock to surge.

**C.    Murray and Friend Dump Their Shares as Getty Stock Surged.**

109.    At 9:31 a.m., one minute after the market opened, Murray logged into

his brokerage account from a computer located around Boston, Massachusetts. He immediately placed a flurry of orders to sell his Getty stock and ultimately sold all his Getty stock before 10:25 a.m.—less than an hour after the market opened.

110.    Murray sold his 209,250 Getty shares that morning at an average price of $7.10 per share that day (around $2.04 per share higher than the prior close). All of his orders were market orders—meaning that he wanted his shares sold at whatever price the market bore. Comparing the inflated prices at which he sold his stock to the prior day's closing price, Murray's scheme resulted in an illicit benefit from his stock sales.

111.    Murray also sold all his Getty call options with a strike price of $7.50 and $10. Murray tried to sell his far out-of-the-money options (strike prices of $12.50 per share and $17.50 per share), but there was insufficient demand in the market for those options. Murray even tried calling his broker that morning for help selling those options, but to no avail.

112.    Comparing the options prices at which he sold on April 24, 2023, with those options' closing price on the prior trading day, Murray received illicit gains (including avoided losses).

113.    Based on realized price improvements in Murray's stock and options positions compared with the prior trading day's closing prices, Murray illicitly benefited from his sham Getty buyout proposal.

114.    His Friend sold all her Getty stock on April 24, 2023, benefiting from the spike in prices caused by Murray's scheme by $177,888.

**D.    Even After Murray Had Dumped His Getty Stock, He Still Claimed Trillium's Offer Was Genuine.**

115.    After Murray sold his Getty stock, he began fielding calls from the

financial press regarding Trillium's proposal.

116.   **Reuters**. On April 24, 2023, at 11:30 a.m., Murray spoke with a reporter from Reuters, who wrote, "Murray told Reuters on Monday that his $4 billion bid for Getty Images Holdings Inc. was genuine and that he made the offer public after the multimedia agency has ignored the activist investor for weeks." When asked about his current holdings, Murray declined to comment.

117.   **Financial Times**. Murray also spoke with a Financial Times reporter, who wrote that "a little-known investor has offered to buy Getty at $10 a share" and that "[n]ot surprisingly, the stock surged by more than a third to $6.85 on Monday." "Scott Murray told Lex that he has his own capital pool and 'deep relationships' with investment banks and buyout groups to fund his bid," but that he "is not working with an adviser and declined to say what assets Trillium manages."

118.   The next day, Financial Times released a follow-up article, reflecting deep skepticism of the bid, criticizing Trillium's "typo-strewn lobbying campaign against Getty that began in April," and noting that "[a]s well as struggling with typing, Trillium seems to struggle with arithmetic."

119.   **Bloomberg**. A reporter from Bloomberg also spoke with Murray on April 25. Murray did not inform Bloomberg that he had already sold his shares or otherwise abandoned the buyout proposal. Instead, Murray "told [Bloomberg] that he has good private equity and Wall Street contacts, but he can't get committed financing for this deal without first doing due diligence on Getty." The author noted, tongue in cheek, "It is a pickle!" "Is this . . . is this what you would call a *fake* takeover offer? I don't know!"

120.   On April 25, the day after he sold all of his Getty stock, Murray also

contacted several private equity firms to discuss options for financing a deal. When he reached out on April 25, Murray did not disclose to those private equity firms that he had already sold all of his Getty stock the day before.

### E.     After Markets Closed on April 25, Getty Rejects the Offer.

121.    Getty did not respond to Trillium's offer until the next day, April 25, at 4:10 p.m.—after trading had closed for the day. Getty explained that Trillium had not provided Getty or its advisors "with any evidence that it, its managing partner or its non-binding, highly-conditional proposal are sufficiently credible to warrant engagement by the Board of Getty Images."

## VII.   Murray's Scheme and Misstatements Violated Securities Law.

### A.     Murray and Trillium Made Material Misrepresentations and Omissions.

122.    Murray and Trillium violated antifraud provisions in the Exchange Act and the Securities Act by issuing the April 24, 2023, press release falsely stating that Trillium and its "principals," including its "Managing Partner," Murray, had made a *bona fide* proposal "to acquire [Getty] for $10 per share in cash."

123.    This statement was false and misleading because neither Murray nor Trillium had any real, substantive intention of purchasing Getty and/or because it omitted material facts necessary to make it not misleading to investors.

124.    Murray also never secured even tentative financing for his $10 per share proposed acquisition price with financial advisors or investment banks. The proposed transaction would have required nearly $4 billion in cash to pay shareholders alone. But neither Trillium nor Murray had anywhere close to $4 billion. Trillium's brokerage account had a balance of less than $18, and Murray's brokerage accounts in April 2023 had a net value of around just $13 million.

Considering Murray and Trillium's inadequate resources, the proposed transaction would have required significant financing. But Murray never contacted an investment banker or made any other effort to secure even tentative financing before releasing the fake takeover offer. Murray and Trillium omitted disclosure of all of these facts to investors.

125.   Murray also never presented Trillium's proposal to Getty before announcing it to the market. A good faith acquirer pursuing a legitimate acquisition of a public company would understand that a premature announcement would disrupt the public markets and could cause the target company's stock price to increase, which in turn, could increase the cost of the proposed transaction. Instead, Murray did the opposite—Murray announced the proposal to the market before broaching the subject with Getty, deliberately manipulating the market for Getty stock with the news—or at the very least, recklessly or negligently manipulating the market.

126.   Murray also made a false statement that "the principals of Trillium **will hold their shares of common stock** of [Getty] if our non-binding proposal reaches a favorable conclusion." (Emphasis added). That statement was false when made because Murray was the only principal of Trillium and he had no intention of holding his shares of common stock. Murray began selling his shares within minutes of the market opening—just one hour after the press release was issued and without waiting for a response from Getty, or even waiting a reasonable time to allow Getty and its Board of Directors to respond. Moreover, all of Murray's orders were market orders—meaning that he wanted to sell shares at whatever price the market bore—showing that Murray wanted to sell his stock as quickly as possible.

127.    While Trillium and Murray claimed that "[w]e may withdraw our non-binding proposal at any time without notice," the proposal was never withdrawn. Murray fielded calls from several reporters throughout April 24 and 25, yet Murray never stated that Trillium's proposal was withdrawn (even though Murray had already sold all his Getty stock before each of the conversations cited above) nor did he contact Getty to withdraw the purported proposal.

128.    The immediate market reaction—a sharp increase in the price of Getty stock and trading volume—after the press release announcement shows that these misrepresentations were material. Defendants' misrepresentations and omissions also were material because a reasonable investor would consider it important to know whether the proposal to buy all of Getty's outstanding stock at $10 per share—or nearly a 100% premium to the prior trading day's closing price of $5.06—was genuine and the prospect of a buyout realistically possible. The false statement that Murray would hold his Getty shares until a favorable conclusion was also material because it gave investors a false sense that the announcement was genuine, rather than what it actually was—just a ruse to dump shares at a higher price.

129.    Murray and Trillium are responsible for the misrepresentations and omissions contained in the April 24, 2023, press release. The press release was attributed to Trillium, while Murray was the only person involved in drafting it and had ultimate authority over its content. Murray admitted on a recorded phone call when discussing the April 24 press release, "well, I was the one who did the press release." Murray's alter ego, Trillium, which nominally issued the April 24 press release, is also liable.

### B.     Murray and Trillium Employed a Scheme to Defraud.

130.   In addition, and separate from Defendants' misstatements and omissions, Murray and Trillium violated the antifraud provisions by directly or indirectly employing a manipulative or deceptive device intended to mislead investors in the offer or sale or in connection with the purchase or sale of securities. Specifically, Defendants schemed to mislead investors into believing that Trillium's proposal was legitimate long enough to pump up the price of Getty and cause a surge in trading volume sufficiently large to sell Murray's stock and options at artificially inflated prices.

131.   Murray relied on Trillium's four earlier press releases to bolster the legitimacy of Trillium's April 24 press release. The earlier press releases had all been issued within a 2-week window preceding the final, April 24 release.

132.   Trillium's first press release had set out Murray's investment hypothesis that Getty should be trading at least $12 per share, including two pages of calculations that gave the superficial (but false) impression of a detailed analysis.

133.   Trillium's other press releases had bolstered Trillium's profile as a functional and substantial investment firm with multiple principals. Trillium maintained a public-facing website that was designed to suggest that it was a legitimate investment firm with multiple partners. But in truth, Trillium was none of those things; it was just a corporate entity serving as Murray's alter ego.

134.   Despite giving the impression that Trillium was a fund that owned a significant stake in Getty, Trillium did not own *any* Getty securities. In fact, during the relevant period, Trillium's brokerage account did not hold any securities whatsoever and its cash balance did not exceed $18.

135.   Trillium's press releases had also burnished Murray's reputation,

which highlighted his background as CEO, CFO, and director, and emphasized his purported "deep experience with . . . leading investment banks and private equity firms." They claimed that he had "[c]ompleted and led over forty [40] M&A transactions," "[c]ompleted over $2 billion of financing both public and private issuances," and had "[s]ubstantial experience leading public companies and making related filings with the SEC."

136.    Those earlier press releases introduced Trillium and Murray to the market and press as legitimate, substantial market participants with ready access to significant financial resources and a keen interest in Getty, which made the April 24 takeover announcement more plausible.

137.    In furtherance of the scheme, Murray sought authorization from his broker to place higher volume options trades, which would allow him to liquidate his Getty options more quickly.

138.    The weekend before the fraudulent buyout announcement, Murray coordinated with his press release distributor to issue the press release shortly before the market opened on April 24, 2023 at 8:30 a.m., closer in time to market opening than his prior releases which were released around 7:00 a.m.

139.    On April 24, Murray sold his Getty stock and many of his options through his broker's online trading platform. He used market orders to sell his stock and liquidated his entire position within two hours of the press release. After the press release on the morning of April 24, Murray never reached out to Getty before selling off all of his shares.

140.    But when he was unable to sell some of his far out-of-the money options on his own, he also called his broker to employ their help with placing

trades.

141.    Murray's scheme also involved conversations with reporters. Murray had to deceive the reporters because if he had admitted the truth—that he dumped as much of his Getty position as he could immediately after the April 24 press release came out—it would become clear that his offer was a sham and the truth could impact his ability to sell the far-out-of-the-money Getty options he still held. As a result, on April 24 and 25, Murray repeatedly told reporters that Trillium's proposal was genuine. When asked about the "hundreds of thousands of shares of common stock and common stock equivalents" cited in Trillium and Murray's pre-market press release, Murray declined to comment, hiding the fact that he had already sold his position despite having promised to "hold [his] shares of common stock" if the proposal "reaches a favorable conclusion." Murray never told any reporter that Trillium's proposal had been withdrawn or that he had sold all of his Getty shares and as many Getty options as he could.

142.    Murray continued to portray to reporters that Trillium's proposal was viable, citing his own capital pool and his purported "deep relationships" in the private-equity industry, with investment banks and buyout groups, and on Wall Street. Murray never clarified that none of his "deep relationships" was a part of the bid. And he never admitted that his personal capital—even including Trillium's $17.32 in cash—was insufficient to fund a $4 billion transaction.

143.    In fact, Murray pretended to attempt to secure financing by contacting purported industry players only after dumping all his shares.

144.    Murray also selectively passed information to his Friend, helping her to benefit from his unlawful scheme.

145. As discussed below, when the Friend later called to tell Murray that a government agency was investigating her Getty trades, Murray told her to destroy relevant evidence and directed her to lie to investigators, all to further his scheme.

## VIII.   Murray Had *Scienter.*

### A.   Murray's Sale of Getty Stock Shows *Scienter.*

146. Murray had no intention of actually acquiring Getty.

147. Murray's conversation with a brokerage representative on April 18, 2023—particularly Murray's repeated statement that he "won't be doing that" when discussing buying back into Getty securities after selling and Murray's repeated requests for higher options trading limits because he "ha[d] a lot of money at stake"— shows that Murray planned to fully exit his investment position in Getty after issuing the April 24 press release, not acquire the entire company.

148. As an experienced, former public-company officer and director, Murray knew (or was reckless or negligent in not knowing) that a shareholder looking to take over a company generally maintains and *grows* their securities holdings in the target company, which is why the press release stated that "[t]he principals of Trillium Capital [meaning Murray] will hold their shares of common stock of the Company if our non-binding proposal reaches a favorable conclusion." But Murray did not wait for Getty to respond to the proposal. Instead, within minutes of the market opening on April 24, 2023, Murray sold off all of his remaining Getty stock.

149. Murray did not present his acquisition proposal to Getty prior to announcing it in the press release. And at the time that his and Trillium's 8:30 a.m. Eastern Time press release was issued, it was only 5:30 a.m. Pacific Time at Getty's corporate headquarters in Seattle, Washington.

150.   Murray was aware that his April 24 press release would impact the market for Getty stock and drive the price up. When his Friend told him at the end of the prior week that she planned to sell her Getty shares, he had urged her to wait at least until the press release came out on April 24.

151.   Murray was prepared to sell and acted quickly to sell his entire remaining Getty stock position on April 24 at an average price of about $7.10 per share—far below $10 per share. Murray hastily placed 44 separate orders to sell his shares of Getty stock within an hour of the market opening at 9:30 a.m. on April 24.

152.   Murray knew (or was reckless or negligent in not knowing) that if he were truly pursuing a takeover, selling Getty stock at less than $10 per share would not make financial sense because he would later need to repurchase those same shares at a higher price in the takeover transaction.

153.   In his conversations with reporters, Murray also tried to conceal that he had sold off all his Getty shares the morning of April 24.

**B.    Murray Tried to Cover Up His Unlawful Scheme—"Delete All My Texts."**

154.   Murray also showed *scienter* when he asked his Friend to delete text messages and directed her to lie to government investigators.

155.    On December 6, 2023, agents from the Federal Bureau of Investigation ("FBI") approached the Friend to ask about her Getty trading. She agreed to call Murray on a recorded line under the pretext of having received a SEC subpoena for her Getty trading records and all communications with Murray concerning Getty.

156.   During the call, Murray told his Friend to let him draft a response. And even though Murray and his Friend had communicated about Getty stock,

Murray told her to lie about their communications and "just say there were none."

157.   Murray also repeatedly instructed the Friend to destroy evidence of their communications about Getty (emphasis added):

> Friend: I mean, we do have some, some communication about it, right? Because we were sending some.
> Murray: [Interrupting] But very little, very little.
> Friend: Yeah, yeah.
> Murray: You basically say, I'm friends with Scott, and I saw that he, I saw the press release, and I was, uh, the early press releases, and thought it would be a good investment because we are friends.
> Friend: Okay.
> Murray: Because I sent a bunch of press releases on this, right? . . . just send it to me, I'll write it for you.
>             . . .
> Friend: When I respond to them, should I tell the truth?
> Murray: Let me write the response. Okay? Let me write the response.
>             . . .
> Murray: Because all I ever sent you were texts.
> Friend: Yeah.
> Murray: And I always delete my texts at the end of the day. **You should delete all my texts from you**. Because then they can't come back.
> Friend: Yeah, okay.
> Murray: **Delete all my texts**.
> Friend: Okay.
> Murray: I delete them at the end of the day. . . . I delete yours at the end of every day . . . I do. And, and, they, you can't get them back. Like once a text is, it's like virginity, once you get, once you delete your virginity you ain't getting it back, that's how it works.
> Friend: Well, I keep, I keep mine, is that a bad idea?
> Murray: Don't keep mine, don't. **Erase all of mine now, okay**? Because I don't think I sent you any emails on it other than maybe the press release, if that.
> Friend: Okay.
> Murray: So, **delete them all**, send me the thing, I'll write the response.

158.   Murray's repeated insistence that his Friend destroy evidence and lie shows his consciousness of guilt and a ready willingness to violate the law.

159.   Later that same day, Murray emailed his Friend with "what I would email back" in response to the pretextual SEC subpoena. Murray told his Friend to respond that she "followed the press releases on Getty Images made by Trillium" and that she "made certain investments upon the press releases I received and not from any communications from Scott Murray or Trillium Capital." Murray told the Friend to emphasize that her trades were "solely based on my read [*sic*] of the various press releases from Trillium Capital and my knowledge that Scott Murray is a very experienced investor."

160.   Murray's draft response was not true, and he knew it was not true. Murray knew that his friend first purchased Getty stock at his urging after text messages and a phone call on April 5, 2023, nearly a week before Trillium issued its first press release on April 11, 2023.

161.   Murry also knew that his Friend sold the rest of her Getty stock on April 24, 2023, not based on a public press release, but because Murray had urged her to wait to sell her Getty stock until after he released that press release.

162.   By urging her to destroy evidence and lie to investigators, Murray exposed his understanding that his communications with his Friend were likely incriminating and also demonstrated his willingness to supply false information to a federal agency.

### C.   Murray Lied to FBI Agents.

163.   On February 12, 2024, FBI agents spoke with Murray at his home.

164.   The agents warned Murray that "when you deal with federal agents, it's a separate federal crime to lie to us." Murray said that he understood, and then he immediately lied about his communications with his Friend about Getty.

FBI: Did you know that [your Friend] was buying Getty?
Murray: No, I just sent her the press releases, and told her to go look at
      them.
FBI: Did you ever tell her to buy Getty?
Murray: I just sent her the press releases.
FBI: Ok, so we know, we know you sold on the 24th
Murray: Yeah
FBI: Did you ever advise her in terms of
Murray: [Interrupting] no.
FBI: when to sell
Murray: Never, never
FBI: or when not to sell?
Murray:  never never never . . .

165.    Murray's statements were false. Murray did tell his Friend to buy Getty stock roughly one week before Trillium issued its first press release regarding Getty, and his Friend bought stock after texting with Murray and speaking with him on the phone. Murray also advised his Friend when to sell.

166.    Murray was lied to federal agents and urged others to lie and destroy evidence to conceal his actions related to Getty.

## CLAIMS

### FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and
### Exchange Act Rule 10b–5

167.    Plaintiff realleges and incorporates paragraphs 1–166.

168.    For the reasons described in this complaint, Defendants Murray and Trillium, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, directly or indirectly: (a) used or employed devices, schemes, or artifices to defraud; (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

169.    Trillium acted as Murray's corporate alter ego, and both should be held liable for either's role in making misstatements or omissions and either's participation in the fraudulent scheme. Murray is the sole officer of the company and directs all its operations. Trillium failed to maintain corporate formalities, including failing to submit corporate records. Murray also used Trillium to perpetrate his fraudulent scheme.

170.    As alleged above, Defendants' fraudulent conduct includes: making a sham proposal to purchase Getty at $10 per share in cash; promising that principals of Trillium would hold their shares of common stock of Getty if their non-binding proposal reaches a favorable conclusion; selling Getty securities based on an artificial increase in stock price caused by the sham proposal; relying on earlier press releases to make the fraudulent buyout proposal appear more credible; seeking increased trading authority and other actions to allow Murray to quickly close out Getty investments; misleading reporters regarding the legitimacy of the proposal to buy Getty; urging Murray's Friend to purchase Getty stock and then tipping her off to time her selling to coincide with a market-moving takeover announcement that would be released on April 24, 2023; instructing his Friend to destroy evidence and lie to federal investigator; and lying, himself, to federal investigators.

171.    While engaged in the above, Defendants acted knowingly or recklessly.

172.    By engaging in the conduct described above, Defendants violated, and

unless restrained will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act

173.    Plaintiff realleges and incorporates paragraphs 1–166.

174.    For the reasons described in this complaint, Defendants Murray and Trillium, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

175.    Trillium acted as Murray's corporate alter ego, and both should be held liable for either's role in making misstatements or omissions and either's participation in the fraudulent scheme. Murray is the sole officer of the company and directs all its operations. Trillium failed to maintain corporate formalities, including failing to submit corporate records. Murray also used Trillium to perpetrate his fraudulent scheme.

176.    As alleged above, Defendants' fraudulent conduct includes: making a sham proposal to purchase Getty at $10 per share in cash; promising that principals of Trillium would hold their shares of common stock of Getty if their non-binding proposal reached a favorable conclusion; selling Getty securities based on an artificial increase in stock price caused by the sham proposal; relying on earlier

press releases to make the fraudulent buyout proposal appear more credible; seeking increased trading authority and other actions to allow Murray to quickly close out Getty investments; misleading reporters regarding the legitimacy of the proposal to buy Getty; urging Murray's Friend to purchase Getty stock and then tipping her off to time her selling to coincide with a market-moving takeover announcement that would be released on April 24, 2023; instructing his Friend to destroy evidence and lie to federal investigator; and lying to federal investigators.

177.   While engaging in the conduct described above, Defendants acted knowingly, recklessly, or negligently.

178.   By engaging in the conduct described above, Murray and Trillium violated, and unless restrained and enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## CLAIM AGAINST THE RELIEF DEFENDANT

179.   Plaintiff realleges and incorporates paragraphs 1–166.

180.   Relief Defendant RSMR Trust received, directly or indirectly, funds and/or other benefits from Defendants which are the proceeds of unlawful activities alleged in this Complaint and to which the Relief Defendant RSMR Trust has no legitimate claim.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

1. Issue findings of fact and conclusions of law that Defendants Murray and Trillium committed the alleged violations.

2. Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Murray, Trillium, and their agents,

servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5].

3.  Enter an order pursuant to Section 21(d)(5) of the Exchange Act permanently enjoining Murray, Trillium, and any entities owned or controlled by Murray or Trillium, from (i) participating in the issuance, purchase, offer, or sale of any security, or (ii) engaging in activities for purposes of inducing or attempting to induce the purchase or sale of any security; provided, however, that such injunction shall not prevent Murray from purchasing or selling securities for his own personal account.

4.  Enter an order against Murray pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibiting him from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

5.  Order disgorgement from Murray and Trillium of all funds received from his illegal conduct, together with prejudgment interest thereon, under Section 21(d)(3), Section 21(d)(5), and Section 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)].

6.  Order disgorgement from relief defendant RSMR Trust of all funds received from Murray's and Trillium's illegal conduct, together with prejudgment

interest thereon, under Section 21(d)(3), Section 21(d)(5), and Section 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)].

7.  Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

8.  Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

9.  Grant such other and further relief as this Court may determine to be just and necessary.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a jury trial on all the issues so triable.

Date: May 31, 2024                    Respectfully submitted,

*/s/ Zachary A. Avallone*
ZACHARY A. AVALLONE (D.C. Bar 1023361)
JONATHAN M. COWEN (D.C. Bar 443664)
MICHAEL KEATING (Conn. Bar 441023)
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
(202) 795-0987
avallonez@sec.gov

*Counsel for Plaintiff*
*Securities and Exchange Commission*